**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RICKY L.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 23 C 6006** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **MARTIN J. O'MALLEY,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(I), 423, over a decade ago in February of 2014. (Administrative Record (R.) 175). He claimed he had been disabled since December 9, 2013 (R. 175) as a result of "Atrial fibrillation, Precordial Pain, LBBB, Heart valve replaced by other means, Hypertension, Obstructive sleep apnea, Hypercholesterolemia, Congenital stenosis of aortic valve." (R. 203). Over the first four years after his application, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. (R. 1-6, 12-32, 75-98). The ALJ found that the plaintiff could perform: "light work . . . except that [he] could occasionally climb ramps and stairs, but he could never climb ropes, ladders, or scaffolds. He could occasionally stoop, kneel, crouch, or crawl. He could never be exposed to unprotected heights, moving mechanical parts, or vibrations. He could not reach overhead on the dominant right side." (R. 20). As such, while he

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

could not return to his work as a carpenter, the ALJ found he could be a parking meter coin collector, a small product assembler, an usher, or a housekeeper cleaner. (R. 25). Plaintiff then filed a lawsuit on May 10, 2018, in federal district court, seeking review under 42 U.S.C. § 405(g). The case was remanded back to the Commissioner to correct certain errors on December 3, 2018. *Lopez v. Berryhill*, 340 F. Supp. 3d 696 (N.D. Ill. 2018).

Back at the administrative level, the plaintiff had another hearing before the same ALJ, who again denied his claim on January 10, 2020. The ALJ found the plaintiff could perform essentially the same level of work as last time: "light work . . . except: occasional climbing ramps and stairs, but no climbing ladders, ropes, and scaffolds; occasional stooping, kneeling, crouching, and crawling; no work at unprotected heights; no more than occasional work around moving mechanical parts or vibrations; no more than occasional overhead reaching with the right upper extremity; and involving at most semi-skilled work . . . ." (R. 1520). The ALJ said this meant plaintiff could perform jobs such as cafeteria attendant, package sorter, or bagger. (R. 1529). The Appeals Council again denied review on October 23, 2020. (R. 1506-08).

The plaintiff was back in federal district court on December 23, 2020. Ten months later, the Commissioner asked for an agreed remand. Then it was more of the same, except there was a different ALJ conducting the hearing and denying the plaintiff's claim after a much more thorough opinion. This time, on November 30, 2022, the ALJ found that plaintiff could perform a more restricted range of light work: "perform light . . . except the [plaintiff] could occasionally stoop, kneel, crouch, crawl and climb ramps and stairs but never ladders, ropes and scaffolds. The [plaintiff] should have avoided working at unprotected heights, with dangerous moving mechanical parts and working with vibrating equipment. The [plaintiff] was able to occasionally reach overhead

2

with the right upper extremity. The [plaintiff] was able to perform simple and routine work and make simple work-related decisions. The [plaintiff] was not able to perform at a production rate or pace work, such as assembly line work. The [plaintiff] was able to frequently interact with supervisors, coworkers and the public but was not able to perform group or team-based activities." (R. 1817-18). This third time around, the jobs plaintiff could perform were: marker, routine clerk, and inspector/hand packager. (R.1831). And, as of August 24, 2023, plaintiff was back in court for third time seeking to overturn this most recent decision. The case was fully briefed on April 16, 2024, and reassigned to me a week and a half later. (R. 24).

## I.

After the most recent administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: right rotator cuff tear, status-post surgical repair; obstructive sleep apnea; congestive heart failure with arrhythmia, atrial fibrillation and aortic valve replacement and depression. (R. 1813). The ALJ found that, although the plaintiff had a handful of other impairments, those did not significantly limit the plaintiff's abilities and were not severe. (R. 1814). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically considering Listings 1.18 (abnormality of a major joint in any extremity), 3.00 (respiratory disorders), 4.02 (chronic heart failure), and 12.04 (mental impairments). (R. 1815). Regarding the plaintiff's mental impairment, the ALJ determined that the plaintiff had moderate limitations in the areas of understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and a mild

limitation in the area of adapting or managing oneself. (R. 1815-16).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to capacity to perform light work, with the following list of additional limitations:

> . . . the [plaintiff] could occasionally stoop, kneel, crouch, crawl and climb ramps and stairs but never ladders, ropes and scaffolds. The [plaintiff] should have avoided working at unprotected heights, with dangerous moving mechanical parts and working with vibrating equipment. The [plaintiff] was able to occasionally reach overhead with the right upper extremity. The [plaintiff] was able to perform simple and routine work and make simple work-related decisions. The [plaintiff] was not able to perform at a production rate or pace work, such as assembly line work. The [plaintiff] was able to frequently interact with supervisors, coworkers and the public but was not able to perform group or team-based activities.

(R. 1817-18). The ALJ then reviewed the plaintiff's hearing testimony. Back in August of 2016, the plaintiff testified that he couldn't work because of constant right shoulder pain, heart problems and sleep apnea. He couldn't lift overhead with his right shoulder and could only lift "light weight" waist high. He could lift a gallon of milk with pain with his right arm, stand for a half hour, sit for up to 45 minutes, and walk for a half block. He took over the counter Ibuprofen and Tylenol for his pain because stronger medication affected his stomach and made him drowsy. The plaintiff used a CPAP for his sleep apnea but would fall asleep during the day and often slept three to four hours during the day. He had chest pain and heart palpitations, and had had two ablations but still had atrial fibrillation. Plaintiff saw a psychiatrist for depression and took Prozac and a sleeping aid, but he couldn't stay focused when reading or watching a TV show, felt depressed, and had 3 to 6 panic attacks a week. (R. 1818-19).

At the plaintiff's second hearing in 2019, the plaintiff reiterated his sleeping and drowsiness issues due to sleep apnea and his heart condition. He testified as to dizziness, chest pains, and shortness of breath with exertion. He would get winded doing simple household chores like taking

4

out the garbage. He explained that he became depressed and started seeing a psychiatrist in September of 2014 because his "whole life changed" and he "couldn't do anything" anymore. (R. 1819).

At the most recent hearing in November of 2022, the plaintiff recounted that he had four shoulder surgeries between 2009 and 2012 for a torn rotator cuff, then went back to work as a carpenter. But, the plaintiff then suffered a heart attack and had to undergo open heart surgery. He again went back to work but, not surprisingly, he could no longer perform the lifting required in carpentry work. In fact, doctors told him to retire from his carpentry job. The plaintiff explained that he did not feel he could have done a sitting job because he did carpentry work his whole life and he was falling asleep during the day because of sleep apnea and could not stay focused. As plaintiff put it, he was in "bad shape" because of his "messed up" shoulder and heart. He again testified to shortness of breath and palpitations upon exertion. It could take 20 to 30 minutes to recover. His wife had to help him with everything. He again testified that he could not lift over his head because of right shoulder pain. The plaintiff once again explained that he was depressed about being unable to return to work and began seeing a psychiatrist in the fall of 2014 and take medications. The medications would make him "very groggy" in the morning and it was "hard for him to do anything" in the morning because he was "out of it." He had trouble falling asleep due to shoulder pain and worry. The plaintiff again testified that he slept with a CPAP machine but it was "not a perfect tool" and he would still sleep poorly and dose off 3 to 4 times a day for 25 to 30 minutes at a time. (R. 1819).

The ALJ then found that, while the plaintiff's "medically determinable impairments could reasonably have been expected to cause the alleged symptoms during the relevant period at issue;

5

however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the preponderance of the medical evidence and other evidence in the record for the reasons explained in this decision for the period at issue." (R. 1820). The ALJ said that the plaintiff's allegations were inconsistent with the underlying objective demonstrating that his physical and psychiatric symptoms stabilized with treatment such that he remained capable of work activity "within the residual functional capacity as stated herein." (R. 1820). The ALJ acknowledged that prior to the alleged onset date of December 3, 2014, the medical evidence demonstrated a history of bicuspid aortic valve and aortic stenosis, obstructive sleep apnea treated with C-PAP since 2009, and right rotator cuff tear due to a work related injury, which was surgically treated on four occasions: April 2, 2009, May 11, 2010, July 11, 2011, and June 18, 2012. (R. 1820). The ALJ noted that echocardiograms showed plaintiff's cardiac stenosis progressed markedly in May 2013, and a July 2013 cardiac MRI showed severe stenosis of the bicuspid aortic valve and marked hypertrophy of the left ventricle. On July 30, 2013, plaintiff underwent an aortic valve replacement, but developed atrial fibrillation post-operatively that required anti-coagulation therapy without further episodes of heart block. An August 2013 chest CT showed mild cardiomegaly, pericardial effusion, and atelectasis in the lungs. Nevertheless, plaintiff was said to be "doing very well in August of 2013, with no cardiovascular symptoms. He was increasing his activity levels and exercises on a regular basis without dyspnea on exertion, chest discomfort or lightheadedness. (R. 1820).

But, not long after that, in February of 2014, the plaintiff was hospitalized for atrial flutter with rapid ventricular response. He was treated and regained normal sinus rhythm on his own, but continued temporary anti-coagulation therapy with prescription Xarelto. On discharge, he was said

to be "doing much better" and tolerating his medications well. In March of 2014, the plaintiff "agreed" with his cardiologist, Dr. Taylor Cope, that "he is not fully disabled from doing any work, but that he cannot do carpenter work." After he stopped taking his oral beta-blocker, plaintiff was again hospitalized in May of 2014 with atrial fibrillation, rapid ventricular response and a baseline left bundle branch block. The plaintiff was treated with an oral beta-blocker which slowed his heart rate, and an echocardiogram showed mild LV dysfunction and a normally functioning aortic valve. He was in sinus rhythm, but cardioeverted to atrial fibrillation, and the plaintiff had to be switched to a "more potent anti-arrhythmic" prior to discharge. Thereafter, he did well and was "feeli[ng] fine" with no complaints in May, June, and July of 2014. In May of 2014, the plaintiff reported that his "tolerance of activity" was about "80% of his normal." (R. 1821). In June, an ECG showed normal LV size and function, strongly suggesting that previous evidence of significant systolic dysfunction represented tachycardia induced cardiomyopathy, which had resolved. A cardiac study in July 2014, showed normal left ventricular size and systolic function with a calculated ejection fraction of 60%. (R. 1823).

Four months later, on September 11, 2014, the plaintiff underwent balloon cryoablation of atrial fibrillation. Following that procedure, plaintiff had "heartbeat irregularities" and "frequent premature atrial contractions," but was said to be "doing reasonably well" with "no clear cardiovascular symptoms." Cardiology exam in December 2014 showed "normal cardiac findings," including "no further atrial fibrillation and improving left ventricular function." (R.1821).

The ALJ then noted that the plaintiff began treatment with a psychiatrist, Dr. Clara Perez, on September 26, 2014, with sessions on October 8 and 24, 2014 and on December 17, 2014, and a prescription for Prozac. And he noted that "the medical evidence of record since the plaintiff's

alleged onset date of December 9, 2013 and prior to his date last insured of December 31, 2014

documents cardiovascular . . . and psychiatric complaints consistent with a diagnosis and treatment

of right rotator cuff tear, status-post surgical repair; obstructive sleep apnea; congestive heart failure

with arrhythmia, atrial fibrillation and aortic valve replacement and depression." (R. 1821).

The ALJ then went on to relate that, during the relevant period, the plaintiff routinely denied

all symptoms – cardiac, musculoskeletal, neurologic, and psychiatric– other than fatigue. The ALJ

added that multiple medical providers described plaintiff as appearing "alert" and in "no acute

distress" without any indication or observation of overt pain behavior or signs of lethargy. The ALJ

said that the level of discrepancy between the plaintiff's lack of complaints to medical providers and

his hearing allegations of persistent and disabling symptoms a raises reasonable question as to

whether the plaintiff was as disabled as he now alleges. (R. 1822). Additionally, the ALJ pointed

out that the objective medical evidence of record during the relevant period at issue "illustrates a

clinical picture of intermittent abnormalities on physical examination with generally preserved

generally cardiovascular, musculoskeletal, neurologic, cognitive and psychiatric functioning . . .

which is not consistent with the [plaintiff's] hearing allegations of extreme limitations . . . ." The

ALJ acknowledged that objective examinations noted intermittent clinical abnormalities, including

irregular cardiac rhythm, systolic ejection murmur, tachycardia, and slightly decreased breathing at

bases with rhonchi, the plaintiff otherwise demonstrated unremarkable cardiac, musculoskeletal,

neurologic, and psychiatric clinical findings on examination. As such, the ALJ found that the clinical

findings on examination were not consistent with the plaintiff's allegations of extreme functional

limitation during the relevant period at issue. (R. 1822).

The ALJ then explained that diagnostic testing during February 2014 showed no objective

8

evidence to corroborate the plaintiff's allegations of an inability to function or to undermine the ALJ's residual functional capacity finding. To support this, the ALJ pointed to: chest x-rays showing persistent left basilar atelectasis; an echocardiogram showing significant concentric left ventricular hypertrophy, global hypokinesis, ejection fraction of 45%, trivial mitral insufficiency, small pericardial effusion, but a structurally normal prosthetic aortic valve without evidence of aortic insufficiency; a chest CT that was negative for pulmonary embolism; a transesophageal echocardiogram showed normal left ventricular size with some degree of concentric hypertrophy and mildly decreased left ventricular systolic function with a visually estimated left ventricular ejection fraction of 45% to 50% and normally functioning bioprosthetic aortic valve with trace of aortic valve regurgitation; an echocardiogram showing significant concentric left ventricular hypertrophy with an ejection fraction of 45%; a chest x-ray showing cardiomegaly; and a transthoracic echocardiogram showing normal left ventricular systolic function, with an ejection fraction at 50% and no significant changes to the previous study. (R. 1822-23).

The ALJ then recounted diagnostic results from May 2014: a treadmill stress that showed ST-T abnormalities due to baseline left bundle branch block with no change from previous tracing; a chest x-ray that again showed discoid atelectasis at the left lung base; a chest CT that showed dependent atelectasis in the bases and patchy atelectasis without abnormalities at would show pulmonary embolism; an echocardiogram that showed normal left ventricular size with mild concentric hypertrophy with a visually estimated left ventricular ejection fraction of 40% to 45% and normally functioning bioprosthetic aortic valve with no evidence of vegetation, regurgitation or stenosis; a chest x-ray that showed trace residual small right pleural effusion; a Transthoracic echocardiogram that showed mild left concentric left ventricular hypertrophy with superimposed

basal septal hypertrophy and "moderately severely reduced" left ventricular systolic function which "varied widely with cycle length" with a visual estimated left ventricular ejection fraction of 30-35%; an esophageal echocardiogram that showed a visually estimated left ventricular ejection fraction of 30% and overall findings similar to his to the prior transthoracic echocardiogram.

Through June and July of 2014, an echocardiogram showed normal LV size and function, strongly suggesting that previous evidence of significant systolic dysfunction represented tachycardia induced cardiomyopathy, which had resolved; an ECG that identified marked sinus bradycardia and left bundle branch block but showed no significant changes when compared with the prior ECG; and a cardiac study that showed normal left ventricular size and systolic function with a calculated ejection fraction of 60%. In September, another transesophageal echocardiogram dated September 11, 2014 noted mild to moderate global hypokinesis with a visually estimated ejection fraction of 35 to 40%, high thrombotic potential and prosthetic aortic valve in position and opening well. A December ECG dated showed atrial pressure beats. The ALJ said that, overall, "diagnostic cardiac testing during the relevant period longitudinally demonstrated "improving left ventricular functioning" and a normal functioning bioprosthetic aortic valve. And, the ALJ added, there was no evidence during the relevant period of diagnostic testing for complaints regarding the plaintiff's right shoulder or obstructive sleep apnea, such as C-PAP titration studies, polysomnograms or x-rays, CT scans or MRIs of the right shoulder, which the ALJ found not consistent with the alleged severity of plaintiff's complaints and alleged extreme functional limitations. (R. 1823).

The ALJ then explained that the plaintiff's course of treatment demonstrated improvement and stabilization. The ALJ acknowledged that the plaintiff was hospitalized in February and May of 2014, but said he underwent successful balloon cryoablation of atrial fibrillation in September of

10

2014, and that the plaintiff was doing reasonably well with "no clear cardiovascular symptoms" by December of 2014. Cardiology exam on December 29, 2014, confirmed "normal cardiac findings," including "no further atrial fibrillation and improving left ventricular function." Aside from routine monitoring and prescription antiarrhythmic drugs and beta blockers, the plaintiff did not require more aggressive treatment, such as pacemaker implantation. (R. 1822-23).

With regard to the plaintiff's obstructive sleep apnea, the ALJ said that although the plaintiff's primary care physician indicated in November 2019 that he maintained his C-PAP machine and supplies, this was not documented in office visits notes. The ALJ noted there was no evidence that the C-PAP was ineffective such that the plaintiff needed more aggressive treatment, such as surgical interventions, hypoglossal nerve stimulation or supplementation with pharmacologic agents. (R. 1823). The ALJ noted that while the plaintiff reported "moderate" daytime sleepiness as early as 2009, he was able to work despite this complaint. A sleep study confirmed "severe sleep apnea," but plaintiff exhibited "remarkable" improvement in his sleep quality and oxygen saturation with use of a CPAP device and plaintiff reported feeling better rested and having a deeper sleep with CPAP. Additionally, the plaintiff did not consistently report daytime sleepiness and issues were not noted in objective examinations and he presented in no acute distress. In a function report and at his hearings, he alleged poor sleep and feeling unrested due to sleep apnea. The ALJ rejected the statement from plaintiff's doctor that he evaluated plaintiff's compliance with CPAP usage but did not document it. (R. 1824).

The ALJ went on to note that, while the plaintiff testified that he was "essentially constantly falling asleep during the day and naps for two to four hours a day, but there is nothing in the record that would support this degree of limitation." The ALJ explained that the plaintiff did not even

report symptoms this extreme in 2009, prior to using the CPAP device at all – he reported waking once per night and moderate daytime sleepiness, sometimes at work. The ALJ added that there was no documentation of worsening in the plaintiff's impairments that could explain a jump from "moderate" symptoms while his sleep apnea was completely untreated to the extreme issues he later alleged despite apparent compliance with his CPAP device. Plaintiff did report "poor" sleep quality, despite CPAP, in March 2015, but this was not a consistent issue in the record. The ALJ again rejected the report from plaintiff's doctor that he suffered extreme fatigue despite CPAP use, calling it "nothing more than a sympathetic description of the [plaintiff's] symptoms [that] does not establish any functional limitations, nor does the conclusion that the [plaintiff] is "disabled and incapable of major productive work." The ALJ added that the doctor's report was accompanied only by a sleep study from 2009, well before the alleged onset date. (R. 1825).

The ALJ then noted that the plaintiff had a few episodes of what he described as mild chest discomfort in July 2014, but had done well since his discharge and said he "felt fine, no complaints." Plaintiff also complained of upper respiratory issues, some fatigue, joint pain, and shortness of breath on exertion. But, the ALJ said that plaintiff's cardiac conditions were noted to have improved, his exam was normal, and he was given a prescription for Amoxicillin. Plaintiff still had a few issues in early December 2014 and "did not feel quite 100%," but his exam was still normal and his provider was going to stop one of his medications in January 2015. And, at a visit at the end of the period at issue, the plaintiff was said to be doing "reasonably well" with no clear cardiovascular symptoms despite complaints of fatigue with some of his medications. The plaintiff reported no dyspnea on exertion, chest discomfort, palpitations, or lightheadedness and a physical examination was normal. Doctors noted that plaintiff's complaints of fatigue were not consistent with his

demonstrated improvement in functioning and "normal cardiac findings." They noted that his tachycardia- induced cardiomyopathy had resolved. In March 2015, plaintiff's doctor noted that his palpitations were infrequent and overall well-tolerated; his exam was largely normal, and he did not appear in any distress. He was told to be more active and lose weight. (R. 1826).

The ALJ went on to note that, while the plaintiff reported symptoms of exertional dyspnea and fatigue prior to the date last insured, the record for the period at issue indicates that these symptoms improved, rather than worsened to the degree the plaintiff now alleges. The ALJ again pointed out that both the plaintiff and his doctor felt that, although he could no longer do carpentry work, there was other work he could do, and that plaintiff 's doctors, rather than limiting him to performing no exertional activity, advised him to increase his level of exertion – to "lose weight and exercise more" – even when he complained of low energy, fatigue, or exertional dyspnea. (R. 1826).

As for the plaintiff's depression, the ALJ acknowledged that the plaintiff initiated outpatient psychiatric treatment with medication monitoring in September of 2014, but added that there was no indication or anticipation that plaintiff's mental complaints warranted more aggressive treatment measures, such as individual counseling, participation in an intensive outpatient program or psychiatric hospitalization. The ALJ said that was not consistent with the alleged severity of plaintiff's complaints and allegedly extreme functional limitations for the period at issue. (R. 1826). The ALJ went on to add that plaintiff's actions and activities during the relevant period were also not consistent with his allegations of extreme functional limitations. The ALJ pointed out that the plaintiff was able to generally independently care for his well being and follow a daily routine as well as manage his finances and medical care. While the ALJ acknowledged that symptoms are fluctuating and subjective, he said "the discrepancy between the claimant's hearing testimony

regarding the intensity and persistence of his symptoms as severe, as well as the corresponding alleged functional limitations, raises reasonable question as to whether the [plaintiff] was as limited as he alleges in light of the [plaintiff's] level of activity by his own admission."

The ALJ explained that, although the plaintiff's ability to care for himself and others as well as to engage in social and other activities of daily living is not in and of itself dispositive, the inconsistency between the plaintiff's hearing allegations and reports of functional limitations with the evidence of record raises reasonable question as to whether the plaintiff was disabled as he alleges. The ALJ added that the preponderance of the evidence – which he said demonstrated generally preserved physical and psychiatric functioning showed that the plaintiff was able to live and meet personal responsibilities within a degree of independence, appropriateness, effectiveness, and sustainability that was not consistent with his allegations of extreme limitations rendering him totally disabled. (R. 1827).

The ALJ then explained that, given the plaintiff's longitudinal treatment, the degree of abnormality on objective imaging and clinical examinations, level of outpatient care, positive response to treatment, and the nature and level of his activities, the plaintiff was limited to light work. To account for complaints associated with plaintiff's cardiac condition, the ALJ said he further limited plaintiff to occasional stooping, kneel, crouch, crawling and climbing ramps and stairs and no climbing ladders, ropes and scaffolds. To account for plaintiff's sleep apnea complaints, the ALJ said he restricted plaintiff from work at unprotected heights and with dangerous moving mechanical parts. The ALJ said he accounted for plaintiff's complaints from his right rotator cuff tear, status post surgical repair with a restriction to occasional overhead reaching with the right upper extremity and against working with vibrating equipment. (R. 1827).

The ALJ continued, explaining how he accounted for plaintiff's mental impairments: to account for the plaintiff's moderate limitation in interacting with others, the ALJ said he found that plaintiff was capable of frequent interaction with supervisors, co-workers and the public, but could not handle group or team-based activities. (R. 1827). To account for the plaintiff's moderate limitation in concentration, persistence, and pace, the ALJ restricted the plaintiff from assembly line work. (R. 1828).

The ALJ then addressed the medical opinions in the record. He gave the July 18, 2013 opinion from physical therapist, Paul Pepich, that the plaintiff had an eleven percent "Whole Person Impairment" little weight because it was based on a workers compensation standard of review and did not specifically outline the plaintiff's functional limitations. The ALJ rejected opinions from plaintiff's treating physician, Dr. Joseph Thometz, that plaintiff could not work in 2011 and 2013 because they predated plaintiff's alleged onset date, although the ALJ noted that the doctor's assessment that plaintiff could not work as a carpenter was consistent with his decision. (R. 1828) The ALJ gave great weight to the opinions from the state agency reviewing physicians that the plaintiff could perform light work with additional postural limitations. He said the opinions were consistent with the record as a whole, but felt there was insufficient evidence to support a finding that the plaintiff should have limited exposure to extreme temperatures secondary to unremarkable respiratory clinical findings. (R. 1828).

The ALJ gave little weight to opinions from plaintiff's physician, Dr. Akbar Rahmani, that plaintiff was "disabled and incapable of major productive work." He noted that the doctor conceded that his opinion was not supported by any of his treatment notes. Indeed, the ALJ explained that the doctor's treatment notes did not document any presentations of distress or reports of excessive

15

daytime sleepiness. He noted that Dr. Rahmani last saw the plaintiff in May 2014 and he assessed the plaintiff's activity tolerance at 80% of normal, and that the doctor said, at that time, that plaintiff was not disabled from all work, but only from his past carpentry work. (R. 1829).

The ALJ next considered the October 2019 and 2022 letters from plaintiff's treating psychiatrist, Dr. Clara Perez, in which she said the plaintiff was "permanently disabled and handicapped." The ALJ gave them little weight because they were recitations of the plaintiff's subjective symptom reports and medical history of cardiac issues, which was outside of Dr. Perez's area of specialization. The symptoms were not supported by the contemporaneous record prior to the date last insured, and there was no description of significant symptoms until March 2015, which was after the date last insured. (R. 1828-29). The ALJ added that the two GAF scores Dr. Perez assigned the plaintiff were inconsistent. The ALJ then concluded that his residual functional capacity assessment for the relevant period from the plaintiff's alleged onset date of December 9, 2013, and through his date last insured of December 31, 2014, was supported by the medical findings, nature and frequency of treatment, the plaintiff's activities, opinion evidence and other factors discussed. (R. 1829).

The ALJ then relied on the testimony of the vocational expert in finding that, because the plaintiff's past work as a union carpenter ranged from medium to heavy, he could no longer perform that work. (R. 1830). But, as the vocational expert testified, there were other jobs the plaintiff could perform that existed in significant numbers in the national economy, such as: marker, DOT 209.587-034, approximately 138,000 jobs nationally; routine clerk, DOT 222.687-022, approximately 157,000 jobs nationally; and inspector and hand packager, DOT 559.687-074, approximately 51,000 jobs nationally. (R. 1831). Accordingly, the ALJ concluded that the plaintiff

was not disabled and not entitled to benefits under the Act.  (R. 1832).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022).  If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g).  The "substantial evidence" standard is not a high hurdle to negotiate.  *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023).  To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Security*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone

of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). While this requirement has been described as "lax", *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), the Seventh Circuit has also explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate

18

the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. Indeed, the Seventh Circuit's opinion in *Jarnutowski*, 48 F.4th 769, exemplifies this subjectivity. Two judges on that panel felt the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting, thought she did, as did the Magistrate Judge who had reviewed the ALJ's decision (by consent) at the district court level. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court explained that the ALJ had to:

> explain why he rejects uncontradicted evidence. One inference from a silent opinion
> is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant.

> That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287.

More recently, the Seventh Circuit has again emphasized that all ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). The court has explained "that social-security adjudicators are subject to only the most minimal of articulation requirements." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024); *see also Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. 2024)(". . . ALJs are 'subject to only the most minimal of articulation requirements"—an obligation that extends no further than grounding a decision in substantial evidence."). So, as ever, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). The ALJ did enough here.

### III.

The plaintiff has a miscellany of criticisms regarding the ALJ's lengthy and thorough opinion, which the court will endeavor to shuffle through one at a time. The plaintiff divides his critiques into two categories: (1) the ALJ reversibly erred in failing to properly evaluate [plaintiff's] mental residual functional capacity (RFC), in accordance with SSR 96-8p, and (2) the ALJ reversibly erred in failing to properly evaluate [plaintiff's] subjective statements under SSR 16-3p. While it is unlikely the plaintiff has omitted any arguments he might have thought of, if he has, they are deemed waived. *Milhem v. Kijakazi,* 52 F.4th 688, 693 (7th Cir. 2022)("Arguments not raised in the district court are waived."); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020)("... arguments omitted before the district court are [waived].").

## A.

First, there are the plaintiff's criticisms of the ALJ's evaluation of his mental residual functional capacity. As the plaintiff notes, the ALJ found that his depression was a severe impairment resulting in moderate limitations in the functional areas of (1) understanding, remembering, or applying information, (2) interacting with others, and (3) concentration, persistence, or pace. The ALJ accounted for these limitations by finding plaintiff was restricted to performing simple and routine work, simple work-related decisions, no production rate pace work such as assembly line work, and frequent interaction with supervisors, coworkers, and the public, but no group or team-based activities. (R. 1817-1818). The plaintiff first complains that the ALJ "did not tether the RFC limitations, however, to any evidence" such as testing, medical opinion, or the plaintiff's testimony or allegations, supporting it only by her own evaluation of the evidence and translation into work related limitations.

It is difficult to read the ALJ's opinion and end up with the impression that the ALJ did not properly and rather painstakingly sift through the evidence. The ALJ summarized and discussed the record – as is proper, *see, e.g.*, *Gedatus*, 994 F.3d at 901 – and weighed and evaluated that evidence to arrive at an RFC. It is, after all – and contrary to the plaintiff's argument – up to the ALJ to weigh the medical evidence. *See, e.g., Morales*, 103 F.4th at 471 ("... time and again we have underscored that our role as a court of review is not to "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination."); *Warnell*, 97 F.4th at 1052 (same). And it is, after all – and contrary to the plaintiff's argument – up to the ALJ to evaluate that evidence and arrive at an RFC finding, which is a legal – and not a medical – finding. *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC

is a matter for the ALJ alone – not a treating or examining doctor – to decide."); *Schmidt*, 496 F.3d at 845 ("the ALJ is not required to rely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians.").

As for SSR 96-8p's promise of a "narrative discussion" of how the evidence leads to various limitations, it is worth reiterating that, in explaining how they get from the evidence to their conclusions that ALJs are subject to only the most minimal of articulation requirements. *Warnell,* 97 F.4th at 1053; *Morales*, 103 F.4th at 471. And, even though the ALJ provided an adequate narrative here, even if she hadn't the court may affirm an ALJ's decision that does not conform with SSR 96-8p's requirements if we are satisfied that the ALJ "buil[t] an accurate and logical bridge from the evidence to her conclusion." *Jarnutowski*, 48 F.4th at 774. The ALJ's thorough discussion of the evidence more than suffices here. We begin with evidence regarding the testing, the medical evidence, and medical opinion the plaintiff seems to think the ALJ ignored.

Unfortunately, in terms of the plaintiff's mental impairment, the plaintiff's brief does not direct the court to any testing – most likely because there isn't any. See Supplemental Rules for Social Security Actions Under § 405(g), Rule 5 ("A brief must support assertions of fact by citations to particular parts of the record."); *Streikus v. O'Malley*, No. 22-2484, 2024 WL 983568, at *3 (7th Cir. Mar. 7, 2024)("[The plaintiff] bears the burden of not just establishing the existence of his condition but the specific limitations affecting his capacity to work."); *Gedatus*, 994 F.3d at 905 ("[The plaintff] bears the burden to prove []he is disabled by producing medical evidence. . . .Yet []he failed to show how h[is] medically determinable impairments caused any limitations beyond those the ALJ found."); *Durham v. Kijakazi*, 53 F.4th 1089, 1096 (7th Cir. 2022) (noting that the claimant bore the burden of establishing that her tachycardia would impede her ability to work or

required limitations beyond those set forth by the ALJ); *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (claimant bears the burden of showing that she has impairments that affect her ability to work and pointing to various diagnoses and complaints is insufficient to establish the existence of a functional limitation). The only "testing" regarding the plaintiff's ability to focus or concentrate is the typical cryptic remarks by his doctors that he is always alert and oriented and in no acute distress. We agree with the plaintiff that these types of routine and superficial observations are not worth much, and that they don't prove plaintiff can work. But, neither do they prove he's disabled.

Then there are the records of plaintiff's psychiatric treatment with Dr. Perez. The plaintiff saw the doctor in "mid-2014" [Dkt. #18, at 3], but he actually didn't begin treatment until mid-October – two months before the end of the pertinent period – after cancelling his first two appointments on September 26, 2014, and October 8, 2014. (R. 1049). While the treatment notes from his sessions with Dr. Perez do indicate he is sad, withdrawn, and has difficulty sleeping through the night, they do not undermine the ALJ's RFC finding:

> October 17, 2014 – sleep interrupted despite melatonin, can not do much physically, sad, used to do it all, withdraws, isolates, [but] not ready to start medication for depression/anxiety, wants to consult [illegible] (R. 1049)
>
> December 17, 2014 – told by cardiologist his [heart][illegible] extra heartbeat, worried for days he just stays in bed, willing now to start [illegible] will start out on Prozac 10 mg [illegible] (R. 1049)
>
> January 28, 2014 – in monthly monitoring due to arrhythmia [illegible] sleeping in daytime, often tired, used to watch TV with family [illegible] very interrupted sleep, will start with Catherine [illegible] for indiv therapy, increase Prozac [illegible] (R. 1049)
>
> February 23, 2015   [illegible] talk to someone; wishes he could feel better GAF 55 (R. 1052)

Difficulty sleeping at night could lead to difficulty in focusing during the day, but the ALJ

did find that the plaintiff was moderately limited in concentration, persistence, and pace, so it is not as though she ignored the psychiatric treatment record, minimal though it may be. And a GAF score of 55, while not dispositive, suggests "[m]oderate symptoms (e.g., flat and circumstantial speech, occasional panic attacks) OR moderate difficulty in social occupational, or social functioning (e.g., few friends, conflicts with coworkers)." https://iaap.org/wp-content/uploads/2020/01/GAF-Scale.pdf. The GAF scale may not line up with the Social Security scale, but the score doesn't undermine the ALJ's finding of moderate impairments in concentration or social functioning.

The plaintiff's "tethering" complaint also mentioned medical opinions, but the only one the plaintiff cites to – a letter from Dr. Perez in October of 2019 (R. 179) – comes *five years* after the plaintiff's insured status expired. As the plaintiff has to concede, it is not of much value in determining whether his mental impairment prevented him from working a half-decade earlier. That's especially the case when one recalls Dr. Perez's treatment notes from the pertinent period were brief jottings that mainly recorded plaintiff's subjective complaints about difficulty sleeping through the night and gave no hint that the plaintiff might be disabled. *See Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021)(contrast between doctor's opinion and doctor's treatment notes supported rejection of doctor's opinion); *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019)(proper to reject opinion from psychologist as it "largely reflected [plaintiff's] subjective reporting.").

So, what opinions does the plaintiff think the ALJ ignored? Unfortunately, the plaintiff does not say. As the plaintiff concedes, the opinions from the state agency reviewing doctors didn't mention any mental impairment limitations, probably because the plaintiff did not claim he had any when he applied for benefits and had not sought any psychological treatment. (R. 75, 85). They

found that plaintiff could perform light work with no additional restrictions (R. 82-83, 92-94, 96), a greater capacity for work than the ALJ found the plaintiff had. Significantly, the plaintiff's own treating physician, Dr. Taylor Cope, had this to say about plaintiff's capacity for work on March 24, 2014, three months after plaintiff's alleged onset of disability and a month after he applied for benefits claiming he was unable to do any work:

> [Plaintiff] feels he is not able to do his carpenter work. He becomes fatigued rapidly. He has no chest pain, shortness of breath, palpitations, cerebrovascular, or peripheral arterial symptoms.
>
> An attorney forwarded forms for residual functional capacity questionnaire. [Plaintiff] came in to discuss all this with me today. We also received a letter specifying that to receive carpenter union or Social Security disability benefits, he has to be totally disabled from all work. After discussion of the need to be straightforward in filling out these forms, I filled out a one page form for the carpenters union. He is meeting with them in two days. *He agrees with me that he is not disabled from doing any work*, but that he cannot do carpenter work.

(R. 1186 (emphasis added)).[2] It is not surprising that this opinion was not mentioned in plaintiff's brief as there seems to be some wires crossed between the plaintiff– who thought he was not disabled from doing any work – and his attorney, who thinks he is.

With no medical records or medical opinion to point to as demonstrating he is disabled from *all* work, the plaintiff, perhaps not suprisingly, resorts to "nitpicking" – or, as the Seventh Circuit recently described it, "flyspecking." *Warnell*, 97 F.4th at 1053. The plaintiff complains that the ALJ wrote that:

> To account for the claimant's moderate limitation in concentration, persistence, and pace, the undersigned finds the claimant could not perform production rate or pace work, such as assembly line work. This limitation accounts for the claimant's allegations of fluctuating cognitive deficits, while acknowledging that the evidence demonstrates the claimant was capable of engaging in activities, such as driving, watching TV and readin

---

[2] In a similar vein, a couple of months later, Dr. Cope noted that plaintiff reported his tolerance for activity was at 80% of normal. (R. 1177).

[Dkt. #18, at 5].  So, essentially, the ALJ credited the plaintiff's allegations to an extent, and made what the plaintiff seems to concede was a more "generous" finding than the objective medical evidence – or even plaintiff's subjective complaints to Dr. Perez –would allow. [Dkt. #18, at 6].  But, it is difficult to see what is wrong with that.  *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019)("This finding was more limiting than that of any state agency doctor or psychologist, illustrating reasoned consideration given to the evidence [plaintiff] presented.").  Is the plaintiff asking that the case be remanded so that the ALJ could offer a restriction more in line with the minimal evidence regarding his mental impairment?  Perhaps a finding that the plaintiff suffered no more than minimal restrictions?  It's difficult to see what good that would do for the plaintiff.  It is, as former Magistrate Judge – now District Court Judge – Iain Johnston aptly put it, a "quizzical argument." *Karla J.B. v. Saul*, No. 19 CV 50019, 2020 WL 3050220, at *4 (N.D. Ill. June 8, 2020)("Essentially, Plaintiff argues the ALJ erred by placing more—not fewer—restrictions on Plaintiff's RFC. Again, this is a quizzical argument.").

With all deference, the argument is essentially a time-waster and, not surprisingly, has been rejected again and again. *See, e.g., Julie S. v. O'Malley*, No. 21 C 4816, 2024 WL 1092683, at *10 (N.D. Ill. Mar. 13, 2024)(Finnegan, M.J.); *Ferida H. M. v. O'Malley*, No. 22 C 6341, 2024 WL 942552, at *7 (N.D. Ill. Mar. 5, 2024)(Harjani, M.J.); *Salvador H. v. Kijakazi*, No. 22 C 7254, 2023 WL 5017944, at *8 (N.D. Ill. Aug. 7, 2023)(Cole, M.J.); *Amy V. v. Kijakazi*, No. 22 C 00009, 2022 WL 17082527, at *10 (N.D. Ill. Nov. 18, 2022)(Pallmeyer, J.); *Anthony L. v. Kijakazi*, No. 20 CV 5184, 2022 WL 2237141, at *4 (N.D. Ill. June 22, 2022)(Cox, M.J.).  It will be again.

The plaintiff also questions whether a moderate restriction on maintaining concentration, persistence, and pace would allow him to perform jobs that did not have production pace

requirements. "A 'moderate limitation' is defined by regulation to mean that functioning in that area is 'fair.'" *Pavlicek*, 994 F.3d at 783. If, as the Seventh Circuit said in *Pavlicek*, a moderate limitation allows a plaintiff to "perform simple, repetitive tasks at a consistent pace", 994 F.3d at 783, surely it would allow the plaintiff here to perform "simple and routine work" that did not require "a production rate or pace work, such as assembly line work." *See Hess v. O'Malley*, 92 F.4th 671, 678 (7th Cir. 2024)(finding that a moderate limitation in concentration, persistence, and pace allowed plaintiff to perform in "a work environment with no fast paced production quota or rate and that any production requirements should be more goal oriented, such as based on a daily or weekly or monthly quota.").

Finally, the plaintiff complains that the ALJ failed to find that he would be off task so often that he would not be able to sustain work. [Dkt. #18, at 11-12]. But, as the plaintiff concedes, the ALJ was only obligated to include limitations in her RFC that she found supported by the medical evidence. *Durham*, 53 F.4th at 1096 (7th Cir. 2022); *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021). And, again, a moderate limitation translates to fair functioning in regard to concentration persistence and pace, not an inability to remain on task sufficiently to sustain work. *Pavlicek*, 994 F.3d at 783; *Hess*, 92 F.4th at 678 n.20.

**B.**

As noted at the outset, the plaintiff also complains that the ALJ failed to properly assess his subjective allegations. If the standard of review for an ALJ's overall decision – the "substantial evidence" standard – is deferential, the standard of review for an ALJ's assessment of a plaintiff's allegations is even more deferential. *Hohman v. Kijakazi,* 72 F.4th 248, 251 (7th Cir. 2023). A court may only overturn an ALJ's evaluation of a plaintiff's subjective symptoms if the plaintiff can show

it is "patently wrong, which means that the decision lacks any explanation or support. *Hess*, 92 F.4th at 679; *Tutwiler*, 87 F.4th at 859. That is what the Seventh Circuit has variously called a "heavy burden," *Milliken v. Astrue*, 397 F. App'x 218, 225 (7th Cir. 2010), a "difficult" burden, *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015), or a "high" burden. *Turner v. Astrue*, 390 F. App'x 581, 587 (7th Cir. 2010). The plaintiff has not met it here.

The plaintiff first takes issue with the ALJ's statement that plaintiff's allegations were "inconsistent with the underlying objective [evidence] demonstrating that the claimant's… psychiatric symptoms stabilized with treatment such that he remained capable of work activity within the residual functional capacity as stated herein." [Dkt. #18, at 12]. But, as already noted, Dr. Perez's notes – focusing on sleep issues – do not show anything indicating plaintiff was incapable of work.

The plaintiff also has a problem with the ALJ stating that there was "no indication or anticipation that the claimant's mental complaints warranted more aggressive treatment measures, such as individual counseling, participation in an intensive outpatient program or psychiatric hospitalization, which is not consistent with the alleged severity of his complaints and associated extreme functional limitations for the period at issue." [Dkt. #18, at 12]. The plaintiff has to concede that the ALJ was correct that plaintiff did not participate in any "intensive outpatient program or psychiatric hospitalization", but cries foul on the ALJ saying he did not undertake individual counseling sessions, pointing to additional notes from Dr. Perez from after the pertinent period. [Dkt. #18, at 12, citing R. 12-13]. But, those notes are the continuation of what the ALJ acknowledged was "outpatient psychiatric treatment with medication monitoring." Despite Dr. Perez's recommendation that plaintiff begin regular individual therapy sessions with "Catherine" a month

28

after the expiration of plaintiff's insured status (R. 1049), there is no record of plaintiff having done so. At least, the plaintiff fails to direct the court to any such record. So, the ALJ wasn't wrong, and she certainly wasn't "patently wrong."

Finally, the plaintiff complains that the ALJ failed to acknowledge his work record, arguing that a "claimant with a good work history '...is entitled to substantial credibility when claiming an inability to work because of a disability.'" [Dkt. #18, at 14, quoting *Stark v. Colvin*, 831 F.3d 684, 689-90 (7th Cir. 2016)]. According to the plaintiff, "[b]y applying for disability, [he] was significantly reducing his income relative to work-related income, and likewise presumptively losing any other employment benefits." [Dkt. #18, at 15]. While not dispositive, "a consistent work history weighs in favor of a positive credibility finding." *Summers v. Berryhill*, 864 F.3d 523, 529 (7th Cir. 2017). *See also Cole v. Colvin*, 831 F.3d 411, 415 (7th Cir. 2016)("... we have said that 'a claimant with a good work record is entitled to [a finding of] substantial credibility when claiming an inability to work because of a disability.' "); *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015)("... a 'claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability.' "). But, as the plaintiff concedes, "[a]n ALJ is not statutorily required to consider a [plaintiff's] work history." *Stark v. Colvin*, 813 F.3d 684, 689 (7th Cir. 2016). And, in this instance, the plaintiff's argument about reduction in income, which is unsupported by any citation to the record, raises some questions.

As the plaintiff suggests, it wouldn't make sense to leave a union carpentry position – a good-paying job – for the "lure" of comparatively meager disability benefits. But that common sense observation does not appear to be applicable here. The plaintiff's earning record in the several years leading up to his alleged onset of disability is not impressive. He had no earnings in 2009, 2010,

29

2011, 2012, and 2014. (R. 184, 187, 194, 197). He earned just $11,731 in 2013. (R. 184, 187, 194, 197). Indeed, in the eight years leading up to his alleged onset date, plaintiff averaged just $8,351 a year. (R. 184, 187, 194, 197). Compared to $11,000 or $8,000, disability benefits might be fairly attractive. Perhaps that's why the ALJ didn't go into the plaintiff's work record in her decision.

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Dkt. #21] is granted, and the plaintiff request for a remand of the ALJ's decision [Dkt. #18] is denied.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/16/24